IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| K-5 REALTY, LLC, a Florida limited liability company, | ) ) ) |
| Plaintiff, | ) ) Case No.: 08 C 1400 |
| v. | ) ) Honorable Judge Charles Norgle ) |
| CONTRIBUTED MUTUAL BENEFITS MORTGAGE SERVICES, INC., an Illinois corporation, and CHARLES CHRISTIAN, individually, | ) Magistrate Judge Brown ) ) JURY DEMAND ) ) |
| Defendants. | ) ) |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION
FOR MORE DEFINITE STATEMENT AND/OR TO STRIKE PORTIONS
OF ANSWER AND AFFIRMATIVE DEFENSES**

The Plaintiff, K-5 REALTY, LLC ("K-5"), by its attorney, Gregg Minkow of Hinshaw & Culbertson LLP, states as follows by way of reply to the Response of the Defendants, CONTRIBUTED MUTUAL BENEFITS MORTGAGE SERVICES, INC. ("Contributed Mutual") and CHARLES CHRISTIAN ("Christian"), relating to K-5's Motion for More Definite Statement and/or to Strike Portions of the Defendants' Answer and Affirmative Defenses:

1. In its Amended Complaint, K-5 alleges that the Defendants breached their written contract with K-5, after K-5 did all it was required to do on its part under the contract. The allegation of full performance by K-5 with conditions on its part appears in ¶ 28 of the Amended Complaint; the Defendants initially answered ¶ 28 with a general denial, rather than the specificity required by FRCP 9(c).

In ¶ A of the Defendants' Response, Defendants appear to agree that they will provide the more definite statement sought by K-5 in connection with the Defendants' answer to ¶ 28: i.e., the Defendants agree to replead, this time with particularity, any facts purporting to show that K-5 did not fully perform under the contract at issue.

The order on K-5's pending Motion should require the Defendants to follow through on this stated intention; provided Defendants do so, this resolves Point II of K-5's Motion.[1]

2.  Par. B on p. 2 of the Defendants' Response refers to ¶ 28 of the Amended Complaint. However, the Defendants' ¶ B actually appears to be in response to Point III of K-5's Motion, which relates to ¶ 20 of the Amended Complaint, rather than ¶ 28.

In Point III of its Motion, K-5 contends that the Defendants' Answer to ¶ 20 states a defense which is barred as a matter of law. In that answer, the Defendants deny that Contributed Mutual was to be the "lender" under the parties' written contract, contrary to the plain language of the written contract. K-5 argues in point III of its Motion that because the Defendants' answer to ¶ 20 is at odds with the unambiguous language of the written contract, the denial can only mean that Defendants will assert a parol understanding which is barred by applicable law. See Motion, at pp. 4-5, ¶¶ 19-21, and the authorities cited there.

Indeed, just as the Motion predicted, the Defendants, in their Response, state that their denial of ¶ 20 "is predicated on the notion that both parties knew that Contributed might or might not be the lender on the proposed financing." That response ignores the authorities cited at in K-5's Motion, and cites no contrary authorities that would permit a defense to stand which is so blatantly at odds with the terms of the parties' written contract.

Consequently, Defendants' answer to ¶ 20 of the Amended Complaint should, as requested in the Motion, be stricken, and the Court should rule that as the law of the case, Defendants are barred from defending against the Amended Complaint on grounds that Contributed Mutual was not, in fact, the lender.

3.  In the first ¶ C on p. 2 of Defendants' Response (there are two paragraphs "C" on that page), the Defendants appear to concede that their Affirmative Defenses are infirm and

---

[1] Point I of the Motion is simply a statement of background facts.

should be stricken, as requested in Point IV of K-5's Motion, at pp. 5-7 thereof. That being the case, the Court should enter an order striking the current Affirmative Defenses for the reasons cited in Point IV of the Motion, and order that the stricken defenses not be replicated, in form or substance, in any new affirmative defenses which the Defendants may hereafter seek leave to plead.

Specifically, the Defendants cannot avoid a ruling on the merits of K-5's argument by not responding to the pending Motion, and then plead essentially the same affirmative defenses as though the Motion had not been brought or as though it lacked merit. Therefore, in the absence of any response taking issue with the substance of K-5's challenge to Defendants' current Affirmative Defenses, those defenses should be stricken or dismissed, with prejudice.

4. The remaining arguments in K-5's Motion (Point V, at pp. 7-8 of the Motion) relate to Defendants' answers to ¶¶ 31, 32, and 39 of the Amended Complaint, which K-5 contends did not fairly address the substance of K-5's allegations in that paragraph, and did not adequately indicate which portions of the paragraph were admitted if the Defendants' intention was to admit in part and deny in part.

Based upon the second ¶ C on p. 2 of the Response, Defendants appear prepared to amend their answers to ¶¶ 31 and 32, so as to acknowledge (i) that K-5's letters demanding a refund of K-5's $600,000.00 advance fee deposit were in fact sent, and (ii) that the letters, in fact, demanded the return of those funds.

With regard to ¶ 31, however, Defendants contend that the paragraph improperly states legal conclusions, which the Defendants are not required to either admit or deny, as to:

    a.    Whether K-5 believed that Christian was Contributed Mutual's agent when the first demand letter was sent; and

    b. Whether that letter revoked documents signed at the "dry closing" on December 3, 2007.

The Defendants are quibbling over trifles.

First, it does not matter whether K-5 believed that Christian was a representative of Contributed Mutual if in fact he was. In their answer to ¶ 5 of the Amended Complaint, the Defendants admit that Christian is and has been, at all relevant times, the President of Contributed Mutual. (See Motion, at Ex. 1 thereto (Defendants' Answer and Affirmative Defenses), p. 2, answer to ¶ 5.) Consequently, there is no rational way to deny that Ex. D (the first letter demanding letter attached to the Amended Complaint) was sent to Christian "as the representative of Contributed."

Second, in their answer to ¶ 29 of the Amended Complaint, the Defendants admit that Contributed never disbursed any loan proceeds, and never countersigned the loan documents signed by K-5 in anticipation of the dry closing. (See Motion, at Ex. 1, p. 7, answer to ¶ 29.) It has long been the law that a party always has the option of revoking documents prior to the other party accepting them, and that any act which is inconsistent with the documents has the effect of revoking them. See *McCauley v. Coe*, 150 Ill. 311, 318-319 (1894) (copy attached hereto). In the present case, K-5's letters demanding a refund of the advance fee is certainly inconsistent with the continued effectiveness of the loan agreement or of any further documents signed in connection with the anticipated closing; consequently, those letters, as a matter of law, had the "legal effect of revoking the documents signed at the dry closing," and the statement in K-5's ¶ 31 alleging such revocation is a statement of fact, not a mere legal argument.

In any event, regardless of whether the demand letters expressly terminated the loan agreement and revoked the closing documents, that agreement and those documents are certainly

revoked now, and the refund of K-5's advance fee deposit – required unambiguously by the written loan agreement – is certainly due now.

In this regard, it has either been admitted or there is no denying that the three letter agreements forming exhibits to the Amended Complaint has been admitted (see Defendants' answer to ¶ 18 of the Amended Complaint); that they called for closing of the loan to be August 31, 2007 (Amended Complaint, at Ex. B, p. 2 under "Closing"); that the loan did not close on that or any other date (see answer to ¶ 29 of the Amended Complaint); and that if the loan did not close, "all payments received by (CMBMS) regarding the (CFC&CF) shall be returned to [K-5]," CMBMS being Contributed Mutual and the CFC&CF being the advance fee deposit at issue. See Amended Complaint, at Ex. C, p. 1, third paragraph under "Commitment Fee, Costs and Closing Fee: (CFC&CF)."

Importantly, the contractual reference to K-5's refund rights does not in any way indicate that it is dependent upon whether K-5 complied with its own obligations under the loan agreement (although the Defendants have yet to identify a single instance of noncompliance by K-5); rather, the right to a refund if the loan did not close on the date specified in the agreement or thereafter is absolute.

Also importantly, Ex. C to the Amended Complaint does not require K-5 to wait any specified period of time beyond the original August 31, 2007 closing date before demanding a return of its money. Further still, the agreement does not require that any closing documents be revoked as a precondition to the refund of the money if the closing did not take place.

In light of what is not and cannot be disputed in the actual text of the loan agreement, and the admission that any documents requiring signature by Contributed Mutual in order for a closing to take place were not, in fact, signed by Contributed Mutual, the legal effect of the demand letters in revoking or not revoking the closing documents (though it seems clear that the

letter revoked them) does not matter with respect to K-5's right to a refund of the $600,000.00 advance fee deposit. Defendants have pled no facts showing how the loan transaction could still be alive and Contributed Mutual not be in breach thereof (by way of affirmative defense or otherwise), and ¶¶ 31 and 32 of the Amended Complaint must be deemed admitted.

With respect to ¶ 39 of the Amended Complaint, the Defendants argue, in conclusory fashion, that the allegations of that paragraph are "compound and argumentative," and therefore in violation of FRCP 8(e)(1) by not being "simple, concise, and direct." However, the Defendants do not attempt to point out specifically where, or how, the allegations of ¶ 39 are, in fact, either compound or argumentative. It was incumbent upon the Defendants, in their Response to K-5's Motion, to be specific when making a contention of this kind; it is not incumbent upon either K-5 or the Court to guess at what the Defendants are trying to say.

In any event, when broken down into its component parts, ¶ 39 passes muster, and except for Defendants' answer to the first sentence of ¶ 39, their answer is evasive and incomplete:

a. The first sentence of ¶ 39 states that Christian converted K-5's funds to his own use. Defendants have denied this sentence, and if they did so frivolously, they are at risk under FRCP 11; for purposes of the Motion, however, since the Defendants have in fact denied the allegation, that sentence is not at issue under the pending Motion.

b. The second and third sentences of ¶ 39 recite statements that Christian allegedly made to Kevin Ward, of K-5, as to what was done with K-5's advance fee deposit. The Defendants should be able to either admit or deny that these are the things that Christian said. They should be required to do so, or should be deemed to have admitted that Christian did, in fact, make the statements alleged by K-5.

    c.    The fourth sentence of ¶ 39 states, in the context of the second and third sentences, that the explanation which Christian gave as to what became of the advance fee deposit was untrue. If the Defendants deny that Christian made the statements attributed to him, we need not even address whether the purported "legal conclusion" in the fourth sentence is accurate; if the Defendants admit that Christian made the statements attributed to him in the second and third sentences of the paragraph, then the fourth sentence ceases to be a question of legal analysis; rather, it is simply a statement of fact to be admitted or denied.

    d.    Defendants do not attempt at all to answer the fifth sentence of ¶ 39, which states that the Defendants satisfied a 4-year-old judgment against them in the middle of their conversations with K-5 about the return of the K-5's advance fee deposit. The Defendants either did or did not satisfy that four-year-old judgment on January 16, 2008; they should be required to admit or deny the allegation, or alternatively, it should be deemed admitted.

    e.    The essence of the sixth sentence of ¶ 39 is that the Defendants "have used the CFC&CF funds other than for their intended purpose, in violation of their fiduciary duty, and are now covering up." The Defendants have not fairly addressed the allegations of ¶ 39 insofar as they have failed to address at all the allegation that they did not use the advance fee deposit for its intended purpose.

In short, there has been no compliance by the Defendants with FRCP 8(d)(2), requiring that any denial of ¶ 39 "fairly respond to the substance of the allegation," nor has there been compliance with FRCP 8(b)(4) that a party who "intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest." In accordance with FRCP 8(b)(6), in conjunction with FRCP 12(e) and FRCP 12(f), the Court should order the Defendants to

respond to each portion of ¶ 39, or deem ¶ 39 admitted except with respect to the first sentence thereof, which was explicitly denied.

WHEREFORE, K-5 Realty prays that the relief sought in its pending Motion be granted in its entirety.

<div style="text-align:right">

Respectfully submitted,

K-5 REALTY, LLC, Plaintiff

By: s/ Gregg I. Minkow
      One of its Attorneys

</div>

Gregg I. Minkow
Laurie S. Randolph
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3000
ARDC No. 6181058
E-mail: gminkow@hinshawlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2008, I electronically filed **Reply in Support of Plaintiff's Motion for More Definite Statement and/or to Strike Portions of Answer and Affirmative Defenses** with the Clerk of the U.S. District Court, Northern District of Illinois, Eastern Division, using the CM/ECF system. Notification of such filings(s) was sent via Hand Delivery and UPS Overnight Delivery to the following:

David Thaddeus Grisamore
Law Offices of David T. Grisamore
53 W. Jackson Blvd., Suite 1634
Chicago, IL 60604
E-mail: dgriz67@sbcglobal.net


HINSHAW & CULBERTSON LLP

By: s/ Gregg I. Minkow
    One of its Attorneys

Gregg I. Minkow
Laurie S. Randolph
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3000
ARDC No. 6181058
E-mail: gminkow@hinshawlaw.com

6327743v1 886125

37 N.E. 232                                                                                                                        Page 1
150 Ill. 311, 37 N.E. 232
**(Cite as: 150 Ill. 311, 37 N.E. 232)**

McCAULEY v. COE
Ill. 1894

Supreme Court of Illinois.
McCAULEY et al.
v.
COE et al.[FN1]

FN1 Reported by Louis Boisot, Jr., Esq., of the Chicago bar.

May 8, 1894.

Appeal from appellate court, first district.

Suit by James I. McCauley and Thomas Swartwout against Albert L. Coe, Aaron B. Mead, and Sarah Curtis to remove a cloud on title. Defendants obtained a decree, which was affirmed by the appellate court. Complainants appeal. Reversed.

West Headnotes

**Quieting Title 318 €—7(2)**

318 Quieting Title
    318I Right of Action and Defenses
        318k7 Cloud on Title
            318k7(2) k. Deeds, Mortgages, and Other Written Instruments. Most Cited Cases
Mortgage by lessee having option to buy fee becomes cloud on lessor's title after expiration of lease, where neither lessee nor mortgagee offers to buy, and lessor rescinds option by conveyance.

*312 E. W. Adkinson, for appellants.
*313 Thornton & Chancellor, for appellees.
BAILEY, J.
This was a bill in chancery to remove a cloud upon the title to real estate. The facts are these: In 1885, Daniel Stauffer was the owner of the property in question, and, as a result of certain negotiations between him and George W. Butler, he built a dwelling house thereon, and after its completion executed and delivered to Butler an instrument in writing in the form of a lease, bearing date October 29, 1885, by which he demised and leased the premises to Butler for the term of one year, commencing November 1, 1885, and ending November 1, 1886. The instrument was in the usual printed form of leases then in use in Chicago, and contained the various covenants and provisions ordinarily inserted in instruments of that character. *314 Among other things, it contained the usual provision authorizing the lessor to declare the term ended for nonpayment or rent, and to reenter, and expel the lessee; and also a covenant on the part of the lessee to surrender and deliver up the demised premises to the lessor immediately on the determination of the lease, either by nonpayment of rent or otherwise; and that, if he should remain in possession of the same after default in the payment of rent, or after the determination of the lease in any of the ways therein provided, he should be deemed guilty of a forcible detainer of the premises under the statute, and subject to eviction and removal, forcibly or otherwise, with or without process of law, the lessee waiving his right to notice of the lessor's election to declare the term at an end under any of the provisions of the lease, or to a demand for the payment of rent or for possession of the premises, but stipulating that the simple fact of nonpayment of rent should constitute a forcible detainer of the premises. The clause reserving rent was as follows: 'And the said party of the second part, in consideration of the leasing of the premises aforesaid by the said party of the first part to the said party of the second part, does covenant and agree with said party of the first part, his heirs, executors, administrators, and assigns, to pay the said party of the first part, as rent for said premises, the sum of $500, in manner following: $100 cash on the execution of this instrument, the receipt of which is hereby acknowledged; $100 January 1, 1886; and $300 on or before November 1, 1886,-with interest at seven per cent. from date, and cost of insurance.' Immediately after the foregoing clause was the following: 'It is further agreed, on full payment of said sums, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the further sum of $1,600, with seven per cent. interest from this date, in manner following: One note for $500, due on or before November 1, 1887, and two notes for $550 each, due respectively November 1, 1888 and 1889, all bearing interest at seven per cent., payable to the order of Daniel Stauffer, and secured by trust deed on the *315 above premises,-the said first party will convey to the second party the above premises by warranty deed, and subject to the taxes and assessments of 1885 and subsequent years.' The instrument made so provision for a forfeitute in case of the nonpayment of the $1,600 above mentioned, nor was any language used expressly making time of the essence of the contract. Butler paid the first installment of rent, and entered into possession of the premises under the lease. He also paid the second installment of $100 at the time of its maturity. On the 16th day of August, 1886, and while so in possession, Butler and wife and one Albert B. Pine and wife joined in the execution of a deed of trust conveying to Albert L. Coe, as trustee, the premises described in the lease, such conveyance being made to secure the payment of a promissory note for $400, executed by Butler and Pine, bearing even date with the deed of trust, and payable to the order of Sarah Curtis three years after date, with interest at the rate of 7 per cent. per annum. This deed of trust was placed on record the next day after its date. Butler made no further payments under the lease, and being, as it seems, unable to make the purchase on the terms therein provided for, he his wife joining him therein, executed to Stauffer a quitclaim deed of the premises, bearing date November 3, 1886, and at the same time surrendered to Stauffer the possession thereof. The quitclaim deed contained the following recital: 'This conveyance being made to release interest in said lots under and by virtue of a clause giving the right of purchase in the lease bearing date October 29, 1885, between the parties aforesaid, the said Butler being unable to perform the conditions of said clause on his part to be performed.' It appears from Stauffer's testimony, which is not contradicted, that he took possession of the premises upon their being surrendered to him by Butler, and that on December 31, *316 1886, he sold and conveyed them to Mary Keating; that he afterwards bought them back, and made a resubdivision thereof, in connection with other adjoining lands which he then owned. On the 22d day of April, 1890, Stauffer filed the original bill in this case, praying to have the deed of trust to Coe declared to be a cloud upon his title, and removed as such. While the bill was pending, he sold and conveyed the premises to James I. McCauley and Thomas Swartwout, and they thereupon appeared and filed their supplementary bill, alleging the conveyance of the premises to them, and setting up substantially the same facts and praying for the same relief as in the original bill. Answers and replications were filed, and, the cause being heard on pleadings and proofs, a decree was rendered dismissing the bill at the cost of the complainants for want of equity. On appeal by them to the appellate court, the decree was affirmed. Although the amount involved is less than $1,000, the complainants have appealed to this court from the judgment of affirmance, the judges of that court having granted the necessary certificate of importance.

Before the deed of trust to Coe can be declared a mere cloud upon the title of the complainants and removed as such, no fraud, accident, or mistake being alleged, it must appear either that the deed was originally invalid and ineffectual to convey to or vest in the trustee or his beneficiary, any interest, either legal or equitable, in the property, or that, by reason of some subsequent event, such interest has terminated and ceased to exist, so as to render the deed no longer a valid security upon any interest or equity in the property. But, if either of these facts appear, the deed of trust is only an apparent, but not a real, incumbrance upon the complainant's property, and should not be permitted to remain as a cloud upon their title. There can be no question, we think, that Butler, at the time he executed the deed of trust, had an interest in the premises *317 which was capable of being conveyed by way of mortgage. We are disposed to concur with the appellate court in the view that the instrument under which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

he was then in possession was, in substance and legal effect, a lease for the term of one year, only a portion of the term having then elapsed. No doubt a mere term for years may be mortgaged, and the lien thus created will be coextensive with the term, and become extinguished by mere lapse of time whenever the term ends. So far, then, as the deed of trust is to be treated as a lien upon the term, it ceased to incumber the property on November 1, 1886, the day the term ended. But coupled with the contract of leasing was the further agreement that, upon payment in full of the several sums reserved as rent, and the execution of notes and a deed of trust for $1,600 in addition thereto, the lessor would convey the property to the lessee. Whatever difficulty there may be in the case relates to the interpretation and effect to be given to this clause of the instrument. It seems clear that the clause did not amount to a contract of sale, since it imposed no obligation on the lessee to purchase. The instrument contained a covenant on his part to pay the sums reserved as rent, but whether he should consummate the purchase by executing the notes and deed of trust was left wholly to his option. What right or interest, then, either legal or equitable, became vested in the lessee by this option to purchase? We are inclined to the view that the option thus given was more than a mere offer on the part of the lessor, which he was at liberty to withdraw at any time before acceptance. It was an option or privilege based upon a valuable and sufficient consideration. The contract embodied in the lease was an entire one, and the same consideration which supported its other provisions applied as well to this. Besides, the lease being under seal, a consideration sufficient to support all its provisions will be presumed. The option seems to have been one which the lessee had at least until November 1, 1886, to *318 accept, and the power of the lessee to withdraw it prior to that date may well be questioned on the ground, supported by many of the authorities, that a binding contract for an option for a given time prevents any retraction of the offer during that time. Tied. Sales, § 41, and authorities cited in note.

But, even assuming the law to be as just stated, the option cannot be regarded as binding on the lessee for an indefinite period after the termination of the lease. Even where an option is based upon a sufficient consideration, and is in the nature of a contract, it is only where the period of its continuance is definite that the right to retract is suspended. The only definite period mentioned in the lease is the term of one year covered by the demise, and after the termination of that period without an acceptance, even if the option itself did not then expire, it continued from that time, subject to be retracted at any time by the lessor. While it is true that the trustee in the deed of trust and his beneficiary acquired a lien upon the legal and equitable rights held by the lessee at the time the deed was executed, they acquired no rights superior to those of the lessee. The equities to which their lien attached were subject, in their hands, to the same contingencies, and were liable to extinguishment in the same manner, that they would have been if they had remained unincumbered in the hands of the lessee. It is not pretended that either they or the lessee, up to the time of filing the original bill in this case, which was nearly 3 1/2 years after the termination of the lease, either accepted the offer of sale contained in the lease, or did any act evidencing an intention to accept it. The lessee, having released and surrendered to his lessor all right remaining in him to exercise the option by the execution of the quitclaim deed, of course could not thereafter accept. But such transaction between him and his lessor could not affect the rights of the *319 mortgagees one way or the other. They, as the assignees of such equities as were based upon the option, were bound to take the same steps to mature and perfect their rights as their assignor would have been compelled to take if no assignment had been made. Even if their long delay in electing to exercise the right of purchase, for which no excuse is given, is not of itself sufficient to extinguish their right, it is clear that during all that period the lessor had the right, as against them, to retract his offer of sale; and any act on his part evidencing an intention to retract, if such is shown, had the effect of extin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

guishing the equities of the mortgagees. We think the sale and conveyance of the demised property by the lessor to Mary Keating, made about two months after the expiration of the lease, was an act of that character. Dickinson v. Dodds, 2 Ch. Div. 463. The same thing may be said of his resubdivision of the property, in connection with other adjoining property owned by him, after his repurchase from Mary Keating. These were acts inconsistent with the continuance of the offer, and evidenced an intention to retract it. It may also be said that the institution of this suit by the lessor to remove the deed of trust as a cloud upon his title before any acceptance of the offer is an act of the same character. We do not think that any question of declaring a forfeiture is involved in the case, as seems to have been supposed by both the superior and appellate courts. The withdrawal of an unaccepted offer, or the retracting of an option which the other party has not seen fit to exercise, involves none of the elements of a forfeiture. It deprives no party of any right, and abrogates no contract, but is merely the exercise by a party of the right to recede from a proposition which the other party has not seen fit to accept.

Nor are we able to see any force in the contention made by counsel that the position of the defendants is in some way *320 benefited by the fact that, immediately upon the expiration of the term of the demise, the lessor procured from the lessee a surrender and quitclaim of all remaining rights vested in him by the lease, and particularly by the clause giving an option to purchase. The rights of the mortgagees, whatever they were, were already vested in them, and could be in no way affected by any subsequent conveyance or release by their mortgagor. Nor are we able to see that the relations of the mortgagees to the lessor were in any respect different after the latter had purchased in the rights outstanding in the lessee than they were before. The case, so far as we can see, furnishes no room for the doctrine of merger in such way as to affect the rights or equities of the mortgagees, either beneficially or otherwise. We are of the opinion that all rights, both legal and equitable, conveyed by the deed of trust, have terminated and ceased to exist. The estate for years has expired by lapse of time, and the equities based upon the option to purchase upon which the trustee and his beneficiary acquired a lien were extinguished prior to the commencement of this suit by the failure to elect to exercise the option, and the retracting of the option by the lessor. The deed of trust therefore has ceased to be operative as a security, but remains a mere cloud upon the title of the complainants. The judgment of the appellate court and the decree of the superior court will both be reversed, and the cause will be remanded to the latter court with directions to enter a decree in accordance with the prayer of the bill. Judgment reversed.

Ill. 1894  
McCauley v. Coe  
150 Ill. 311, 37 N.E. 232

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.